IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JESSE D. BYRD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 12-00234-N |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Plaintiff Jesse D. Byrd ("Byrd") filed this action seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner") that he was not

entitled to Supplemental Security Income (SSI) under Title XVI of the Social Security

Act (the Act), 42 U.S.C. §§ 1381-1383c.  Pursuant to the consent of the parties (doc. 21),

this action has been referred to the undersigned Magistrate Judge to conduct all

proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and

Fed. R.Civ.P. 73.  *See* Doc. 22.  The parties' joint motion to waive oral arguments (doc.

20) was granted on December 13, 2012 (doc. 22).  Upon consideration of the

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit in view of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

administrative record (doc. 10) and the parties' respective briefs (docs. 11 and 18), the undersigned concludes that the decision of the Commissioner is due to be **AFFIRMED**.

I.     Procedural History.

Plaintiff Jesse D. Byrd filed an applications for DIB and SSI benefits on March 9, 2009, (Tr. 90-92), claiming an onset of disability beginning December 14, 2005, "the day that he sustained a severe break to his left leg and ankle in a work-related accident" (Tr. 93-94). Byrd was forty-seven years old at the time he filed his application (Tr. 93, 264). The application was denied on June 2, 2009. (Tr. 42-47).  Byrd timely requested a hearing on July 27, 2009 (Tr. 50-51) before an Administrative Law Judge ("ALJ").  A hearings was held on July 27, 2010.  (Tr. 257-287).  The ALJ issued an unfavorable decision on October 5, 2010.  (Tr. 16-30).  Byrd requested a review by the Appeals Council, which was denied on February 7, 2012 (Tr. 5-8), thereby making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981, 422.210(a) (2012)[2].  Byrd has exhausted all his administrative remedies and this case is ripe for judicial review under § 205(g) of the Act, 42 U.S.C. § 405(g).

II.     Issues on Appeal.

1.     Whether the ALJ properly evaluated the opinions of Byrd's treating physician, Frank B. Fondren, III, M.D.

2.     Whether the ALJ ignored Dr. Fondren's opinion regarding Byrd's pain.

---

[2] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition.  Also, all references are to Part 404 of the regulations, which addresses claims under Title II of the Act. All of the cited regulations have parallel citations in Part 416 of the regulations, which addresses claims under Title XVI of the Act.

3.      Whether the ALJ properly determined Byrd's Residual Functional Capacity ("RFC") in view of all the evidence of record.

III.    Standard of Review.

A.      Scope of Judicial Review.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. See, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996);  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400;  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).   See also, Martin, 894 F.2d at 1529 ("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence.");  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch

v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL

32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).

Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ

decision will not be overturned where "there is substantially supportive evidence" of the

ALJ's decision.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

   The ALJ is responsible for determining a claimant's RFC, an ingrained principle of

Social Security law.  *See* 20 C.F.R. § 416.946(c) ("If your case is at the administrative

law judge hearing level under § 416.1429 or at the Appeals Council review level under §

416.1467, the administrative law judge or the administrative appeals judge at the Appeals

Council (when the Appeals Council makes a decision) is responsible for assessing your

residual functional capacity.")  "Residual functional capacity, or RFC, is a medical

assessment of what the claimant can do in a work setting despite any mental, physical or

environmental limitations caused by the claimant's impairments and related symptoms."

Peeler v. Astrue, 400 Fed.Appx. 492, 493 n. 2 (11th Cir. Oct.15, 2010), *citing* 20 C.F.R. §

416.945(a).  *See also*, Hanna v. Astrue, 395 Fed.Appx. 634, 635 (11th Cir. Sept.9, 2010)

("A claimant's RFC is 'that which [the claimant] is still able to do despite the limitations

caused by his ... impairments.'")(*quoting* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th

Cir.2004).  "In making an RFC determination, the ALJ must consider all the record

evidence, including evidence of non-severe impairments." Hanna, 395 Fed.Appx. at 635

(citation omitted); *see also* 20 C.F.R. § 416.945(a)(1) ("We will assess your residual

functional capacity based on all the relevant evidence in your case record."); 20 C.F.R. §

416.945(a)(3) ("We will assess your residual functional capacity based on all of the

relevant medical and other evidence.").  The regulations provide, moreover, that while a claimant is "responsible for providing the evidence [the ALJ] ... use[s] to make a[n][RFC] finding[,]" the ALJ is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary," and helping the claimant get medical reports from her own medical sources. 20 C.F.R. § 416.945(a)(3). In assessing RFC, the ALJ must consider any statements about what a claimant can still do "that have been provided by medical sources," as well as "descriptions and observations" of a claimant's limitations from her impairments, "including limitations that result from [ ] symptoms, such as pain[.]" *Id*.

In determining a claimant's RFC, the ALJ considers a claimant's "ability to meet the physical, mental, sensory, or other requirements of work, as described in paragraphs (b), (c), and (d) of this section." 20 C.F.R. § 416.945(a)(4).

> (b) Physical abilities. When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

> (c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and

work pressures in a work setting, may reduce your ability to do past work and other work.

(d) Other abilities affected by impairment(s). Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

20 C.F.R. § 416.945(b), (c) & (d).  *See also* Kennedy v. Astrue, 2012 WL 2873683, * 7-8 (S.D. Ala. July 13, 2012).

B.    Statutory and Regulatory Framework.

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the

meaning of the Social Security Act which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).  The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id.* at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence.  *Id.*  It also can contain both exertional and nonexertional limitations. *Id.* at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"),or hear testimony from a vocational expert (VE). Id. at 1239–40.

IV.   Findings of Fact and Conclusions of Law.

A.  Statement of Facts.

1.   <u>Vocational Background</u>.

Byrd was born on December 13, 1961, and was 48 years old at the time of his administrative hearing. (Tr. 264).   Byrd entered but did not finish the tenth grade (Tr. 266).  He testified that he was a poor reader but his school records indicate that he made A's, B's and some C's when he was in school (Tr. 266).   He last worked on December 14, 2005, in logging using skidders, loaders and log trucks as well as chainsaws in the woods itself.  (Tr. 268)  At the time of his injury, Byrd worked for someone other than himself and received worker's compensation from his employer. (Tr. 269-70).  Prior to this employment, Byrd was self-employed and had his own trucks. (Tr. 68-69).  Byrd was insured for a period of disability and Disability Insurance Benefits through December 31, 2005, but not thereafter. (Tr. 18, 260-62).

2.   <u>Plaintiff's Testimony</u>.

Byrd testified that he has not worked since he injured his left ankle in a work-related accident in 2005and underwent subsequent surgeries. (Tr. 272).  When asked to describe how his left ankle injury affects him, Byrd testified, in sum, that he experienced cramps[4] two to three times a day and lasting three to seven to 15 seconds, sometimes waking him up at night (Tr. 272, 274).  He also testified that "sometimes it just goes numb" but he then "takes a stimulator to it and leave it on for probably two to three minutes … [j]ust about every morning." (Tr. 273).  Byrd said that standing for 15 to 20

---

[4] Byrd described the cramps as being "at the top of his foot" and would "come through my leg." (Tr. 272).

minutes makes it worse (Tr. 273).  He indicated that he could walk for 10 or 15 minutes and can sit "for a while" until he is subject to a cramp (Tr. 273).  Byrd again confirmed, however, that he only gets these cramps "two to three times a day and they last three to seven seconds" (Tr. 273).  Byrd denied being subject to any mental health issues (Tr. 274-275).  Byrd has not alleged that any of his medications result in side effects that limit his ability to perform activities of daily living.[5]

Byrd also testified that he was recently diagnosed as having a "blocked artery" but it was only 45 percent blocked[6] and he was given "some blood pressure pills and, I think, blood thinners." (Tr. 271). Although he agreed that he was not illiterate and that he made A's, B's and some C.s while in school, Byrd stated that he was a poor reader (Tr. 266-67). He said that most of his career had been in logging (Tr. 268).

Byrd further testified that he lived in a mobile home with his son, the son's wife and their four children aged nine and younger (Tr. 264-65).  He did not have to do any household chores including making his bed and doing his laundry (Tr. 275). He walks his grandchildren to and from the bus stop, which is about 50 feet from the house, each school day (Tr. 275).  He goes to church about twice a month, not every Sunday (Tr. 275-276).  He "mostly sit[s]" during the day "[w]atching T.V." (Tr. 276).  He had no problem

---

[5] This testimony is not inconsistent with either Dr. Fondren's declaration on July 31, 2009, that "[m]edication side effects can be expected to be severe and to limit patient's effectiveness. . ." (Tr. 231), or his subsequent declaration on July 23, 2010, that "[m]edications can cause side effects which impose some limitations upon the patient . . ." (Tr. 235), inasmuch as Dr. Fondren has not confirmed the existence of these possible side effects.

[6] Medical records reveal only a 10% blockage (Tr. 241).

understanding the television shows that he watched, such as Frasier and Gunsmoke (Tr. 277).

Byrd testified that he has a driver's license and seldom drives but that he drove himself to the hearing and (Tr. 276), a distance of thirty-one miles (Tr. 25).  He also testified that "[s]ometimes I go to my other son's house . . . about a mile or a mile and a half [away]"  (Tr. 276).  During the summer, Byrd testified that he would "keep an eye on [his] grandchildren" if their mother was not home (Tr. 276).  Byrd testified that he used to drink a six pack of beer per day but stopped this practice after he was injured (Tr. 278).

3.  Medical Evidence Before the ALJ.

Byrd's medical records begin with the records of the treatment of his compound fracture of the left ankle on December 14, 2005 (Tr. 157-66).  He was admitted for treatment by Frank B. Fondren, III, M.D. (Tr. 157).  X-rays of the left ankle revealed "comminuted fractures of the distal fibular and tibial shafts . . . with part of the proximal tibial fracture fragment having perforated the skin" (Tr. 166).  He underwent surgery which included an external fixation of the fracture (Tr. 165), was hospitalized without complications (Tr. 157) and was discharged on December 18, 2005, with a prescription for pain medication and instructions for no weight bearing on the left leg and to use crutches (Tr. 158).  Byrd's first follow-up appointment was on December 21, 2005, with Dr. Fondren, who has continued to be his treating physician (Tr. 158).  Dr. Fondren noted that "the wounds look good" and there was no sign of infection.

The medical records show that, on the fourth post-operative office visit on January 18, 2006,  Byrd complained of "some discomfort in the mid shaft tibial fixation pins for

his external fixator" (Tr. 201).  Dr. Fondren opined that there appeared to be a

"superficial infection," which he cultured (Tr. 201).  An x-ray taken at that time revealed

that the "[p]osition and alignment of the fracture fragments are unchanged" when

compared with an x-ray taken on December 28, 2005 (Tr. 208).  Byrd was instructed to

return in 48 hours when the culture results should be ready (Tr. 201).

On January 20, 2006, Byrd underwent out-patient surgery to remove the external

fixator and irrigate and debride the pin tracts (Tr. 209).  He was placed in a short leg cast

(Tr. 209).  He tolerated the procedure well and had no complications (Tr. 209).  A follow-

up x-ray after the cast was in place showed that the fracture fragments had maintained

their position as seen on the previous x-ray. (Tr. 210).  An x-ray taken on January 25,

2006, showed "continued good position of the distal tibia and fibula fracture"  (Tr. 200).

Byrd continued in the cast with instructions to return in two weeks "to determine if the

cast could be removed and a brace applied (Tr. 200).  On February 8, 2006, x-rays

showed "very good position" and Byrd was told that he need not be rechecked until "four

to six weeks" (Tr. 199).

On March 1, 2006, Dr. Fondren noted that Byrd's short leg cast would be removed

in three weeks and he would "begin range of motion exercises" (Tr. 198).  Dr. Fondren

also reported "early callus formation" at the fibula and satisfactory alignment at the tibia

(Tr. 198).

Byrd showed continued healing when his cast was removed on March 22, 2006,

with the "comminuted distal tibia . . .healing well" while the "medial aspect of his

fracture needs additional healing" (Tr. 197).  He was directed to start range of motion ("ROM") exercises and return in four weeks (Tr. 197).

On April 19, 2006, Dr. Fondren noted that Byrd was "still having a significant amount of pain . . . in the anterior central portion of the ankle joint" but that the x-rays showed "additional healing of his comminuted distal tib/fib fracture [and] [t]he actual joint space looks quite good" (Tr. 196).  Byrd received an "intra-articular injection of Depo-Medrol and Xylocaine" and instructions to increase his ROM exercises and return in 4-6 weeks (Tr. 196).

On May 10, 2006, Dr. Fondren reported that the intra-articular injection had improved Byrd for only a couple of days, that his pain continued which now included some Achilles tendonitis, and that, with increased walking, Byrd had increased swelling from the mid calf down (Tr. 195).  Byrd was instructed to begin using his crutches and discontinue ambulating with weight bearing on the left ankle, continue ROM exercises and return in three weeks for reevaluation  (Tr. 195).  Dr. Fondren also recommended that, if the Achilles tendonitis is not "significantly resolved," the area undergo either injection or phonophoresis[7] (Tr. 195).  Dr. Fondren opined that Byrd was unable to return to work and "may require a bone stimulator in order to increase the healing across his fracture site" (Tr. 195).

---

[7] Phonophoresis is "the transdermal introduction of a topical agent [such as, hydrocortisone, aspirin, and lidocaine] into the body using mechanical energy supplied by ultrasound."  Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health (7th Ed. 2003).

On May 31, 2006, Byrd reported less pain since discontinuing the weight bearing (Tr. 193). Dr. Fondren noted that the pain he did experience was in the ankle region and that his Archilles tendon was "tight" (Tr. 193). Byrd was instructed to begin physical therapy, continue with his Aleve twice a day and return for reevaluation in four weeks (Tr. 193).

Although Byrd complained on June 28, 2006, of continuing pain and Dr. Fondren noted that his open fracture had not completely reunited, Byrd was instructed to continue physical therapy for three weeks and return for reevaluation in four weeks (Tr. 194). Dr. Fondren attributed the continued pain to the severity of the original injury (Tr. 194).

X-rays taken on July 26, 2006, revealed "good healing" of Byrd's fracture. Consequently, Dr. Fondren opined that Byrd needed arthroscopy and joint debridement due to the "severity of [Byrd's] pain and limitation of his function" (Tr. 192). Dr. Fondren opined that "[i]f this does not sufficiently limit his pain then, in the future, he may require an ankle fusion" (Tr. 192). Left ankle arthroscopy and arthroscopic debridement was performed on August 7, 2006, and Byrd tolerated the procedure well and without complications (Tr. 205-206). Dr. Fondren reported that he had debrided a "lot of scar tissue within the ankle joint" (Tr. 189). At the August 14, 2006, office visit one week following the arthroscopic surgery, Byrd was instructed to "begin increasing range of motion of the left ankle" and "start a weight reduction program" because he now weighed 258 pounds (Tr. 189).

Byrd's ROM was found to be "improving" on August 28, 2006, with "about 45 to 50 degrees of flexion and about 10 degrees of dorsiflexion" (Tr. 188). He was instructed

to continue to increase his ROM and return in three weeks (Tr. 188).  On September 18, 2006, Dr. Fondren noted that Byrd was continuing to have difficulty ambulating and experiencing pain primarily "along the lateral aspect of the left ankle and [] above the ankle joint" (Tr. 187).  Byrd was returned to physical therapy "to attempt to regain range of motion of the ankle" (Tr. 187).   On October 11. 2006, Dr. Fondren continued the physical therapy with emphasis on "dorsi and plantar flexion" and directed Byrd to begin "stationary bike activities" (Tr. 186).

On November 22, 2006, Dr. Fondren reported that Byrd's left ankle motion had improved with physical therapy and he was having less swelling (Tr. 185).  Byrd was instructed to "progress to weight bearing as tolerated and continue to increase his range of motion in therapy" (Tr. 185).

Byrd reported on December 20, 2006, that he was doing well and using only one crutch until a week before this office visit when he began to experience increasing left ankle pain (Tr. 184).  Dr. Fondren reported that the pain was not due to instability but, as evident on the x-rays, "a spur on the distal portion of the medial malleolus, which appears to be butting against a spur in the talus" (Tr. 184).  Depo-Medrol and Xylocaine was injected into the area and physical therapy was discontinued (Tr. 184).  The injection provided some relief and on January 10, 2007, Dr. Fondren started Byrd on "a work hardening program with limited walking" (Tr. 183).  Byrd was instructed to return in eight weeks (Tr. 183).

Byrd continued to complain of pain and x-rays revealed enlargement of the osteophyte in the area of Byrd's medial malleoulus (Tr. 182).  On March 12, 2007, Dr.

Fondren ordered that Byrd be fitted for an ankle brace with metal reinforcement to alleviate some of his pain and prescribed some Lortabs (Tr. 182).   Byrd improved with the ankle brace but still experienced some pain and swelling (Tr. 180-181).  On May 15, 2007, Dr. Fondren declared that Byrd had reached his "maximum medical improvement" and that he had a permanent partial disability rating of 30% to his left lower extremity  by virtue of his loss of motion (Tr. 180).  Byrd was instructed to continue using his brace, to take Ibuprofin 800 mg. three times a day, and to "be rechecked as needed" (Tr. 180).

On July 10, 2007, Dr. Fondren attributed Byrd's continuing left ankle pain to traumatic arthritis and stated that Byrd would not be able to return to his prior work because it involved "a lot of climbing" (Tr. 179).  Dr. Fondren further reported that Byrd was going to ask his boss if there was other work he could do that did not involve a lot of climbing or standing (Tr. 179).  Byrd was instructed to continue to wear the brace and use Ibuprofin for pain. On July 24, 2007, Byrd reported that he continued to have pain and swelling in the left ankle and that his boss was unable to accommodate his limitations (Tr. 178).   Dr. Fondren planned to recheck Byrd in three months (Tr. 178).

Byrd reported on September 6, 2007, that he had tried a muscle stimulator which had reduced his pain (Tr.177).  Dr. Fondren approved the treatment and ordered that Byrd be supplied with the stimulator (Tr. 177).  On November 1, 2007, Dr. Fondren stated that Wokmen's Comp had to be contacted because Byrd had not received the muscle stimulator he had ordered (Tr. 176).  He also opined that Byrd might require arthroscopic surgery to remove the medial malleolar spur which was shown on x-ray to have enlarged (Tr. 176).  Byrd was to be rechecked only "as needed" (Tr. 176).

16

Byrd returned on January 15, 2008, and reported that he had a lessening of the pain and swelling with his muscle stimulator and continued to wear his brace (Tr. 175). On April 17, 2008, Dr. Fondren noted the presence on x-ray of the medial malleolar spur and arthritis and opined that Byrd would benefit from an injection of Depo-Medrol and Xylocaine, which he administered (Tr. 174). He planned to reevaluate Byrd if not significantly improved in four to six weeks (Tr. 174). The injection was repeated on July 31, 2008 (Tr. 173). Byrd did not return to Dr. Fondren until November 11, 2008, an interval of almost four months, when it was reported that he had lost weight, which would help his ankle pain (Tr. 172). Dr. Fondren noted his plan to proceed with the Depo-Medrol and Xylocaine injection (Tr. 172).

Byrd next presented to Dr. Fondren on May 14, 2009, about six months since his last appointment and two months after filing his applications for social security benefits, complaining about a recent increase in pain (Tr. 238). Dr. Fondren noted "some mild swelling" and his past improvement with "Depo-Medrol injections" (Tr. 238). Consequently, Dr. Fondren planned to administer a Depo-Medrol injection and prescribed Lortabs (Tr. 238).

On May 16, 2009, Byrd was examined by Elmo Ozment, Jr., M.D., a consultant, who reported that, while wearing his brace, Byrd "was able to walk easily into the examination room," required no assistance, "could sit comfortably and . . .get on and off the examination table," "could take his shoes off and put them back on," "could tandem walk . . . [and] bend over to within 10 inches of the floor" (Tr. 213, 214). Dr. Ozment stated that the brace was prescribed by a physician and was medically necessary because,

without it, Byrd "cannot ambulate well" or bend over (Tr. 214).  Dr. Ozment reported

that Byrd's ankle had a [d]orsiflexion of 0-20 degrees and a plantar flexion of 0-40

degrees, bilaterally (Tr. 214).  Byrd was also observed to be "very tender over a possible

bone spur over his left medial malleolus of the left foot" and have "decreased sensation to

pinprick in the lateral aspect of the top portion of his left foot" (Tr. 215).  Dr. Ozment

observed that "[t]he left foot was not deformed, but [Byrd] did have evidence of multiple

surgeries on the foot, but he did have a pretty good range of motion of the foot despite all

the surgeries" (Tr. 215).  Dr. Ozment also noted that Byrd's upper body and lower

extremities exhibited normal strength, muscle tone and bulk (Tr. 215).

On July 31, 2009, Dr. Fondren completed the first of two physical capacities

evaluations and pain assessments of Byrd (Tr. 231-232).  He stated that Byrd was able to

sit for 6 hours and stand/walk for less than 1 hour at a time; was able to sit for 7 hours

and stand/walk for 1 hour in an 8 hour work day; could continuously lift up to 10 lbs.,

occasionally lift up to 25 lbs., and never lift over 26 lbs.; could occasionally carry up to

20 lbs., and never carry over 21 lbs.; had no restrictions relative to the use of his hands

and right foot but could not use his left foot for repetitive movements as in pushing and

pulling of leg controls; was able to reach but restricted from bending, squatting, crawling

and climbing or working at unprotected heights; had mild restrictions with respect to

exposure to marked changes in temperature and humidity as well as being around moving

machinery but could drive automobile equipment without restriction (Tr. 232).  Dr.

Fondren also opined that Byrd had pain to such a degree as to be distracting to the

adequate performance of work activities and that medication side effects could be severe

enough to limit Byrd's effectiveness due to distraction, inattention or drowsiness (Tr. 231).

Byrd's next appointment with Dr. Fondren was not until November 3, 2009, when he complained about a "flare-up of his left ankle pain" but had "no obvious swelling" (Tr. 237).  Dr. Fondren again planned to administer a Depo-Medrol injection and prescribed Lortabs (Tr. 238).  Thereafter, Byrd failed to show for an appointment scheduled for March 16, 2010 (Tr. 237) but did return on April 27, 2010, when Dr. Fondren noted that most of Byrd's pain was "localizing to the medial aspect of the ankle," he is "neurovascularly intact," he still "has limited motion . . . due to his traumatic arthritis," he is tender over the "prominence of the medial malleolar spur," and the x-rays taken were "essentially unchanged" (Tr. 233).  Dr. Fondren again planned to administer a Depo-Medrol injection and prescribed Lortabs (Tr. 233).

On May 3, 2010, Byrd was admitted to the hospital with chest pains and underwent a cardiac catheterization which revealed "10% lesions in the left main, mild diffuse 10% lesion of left anterior descending and mild 10% proximal lesion in the right coronary artery" (Tr. 241).  He was discharged in stable condition, with prescriptions for

blood pressure and cholesterol medications[8] and instructed to find a primary physician to look after his "untreated hypertension" (Tr. 241). No follow-up is reported in the record.[9]

Byrd did not return to Dr. Fondren until July 23, 2010, who noted that his pain is due to the traumatic arthritis, that he is applying for disability, and that he may need additional injections for the pain in the future (Tr. 236). Dr. Fondren opined in his office notes that Byrd "is unable to do anything other than sit down type activities" (Tr. 236). Dr. Fondren also completed a second physical capacities evaluation in which he stated that Byrd was able to sit for no more than 1 hour and stand/walk for less than 1 hour at a time; was able to sit for 4 hours and stand/walk for less than hour in an 8 hour work day; could only occasionally lift or carry up to 10 lbs., and never lift or carry over 11 lbs.; had no restrictions relative to the use of his hands and right foot but could not use his left foot for repetitive movements as in pushing and pulling of leg controls; could frequently reach but could not bend, squat, crawl and climb or working at unprotected heights or around moving machinery; had moderate restrictions with respect to exposure to marked changes in temperature and humidity, driving automobile equipment and exposure to dust, fumes and gases (Tr. 234). Dr. Fondren also opined that Byrd had pain to such a degree as to be

---

[8] The prescriptions given to Byrd included metoprolol, "a beta-blocker that affects the heart and circulation (blood flow through arteries and veins) [and] is used to treat angina (chest pain) and hypertension"; lisinopril, "used to treat high blood pressure"; and pravastatin, a "lipid-altering agent" used to reduce cholesterol. *See* www.drugs.com.

[9] The ALJ concluded that Byrd's coronary artery disease does not meet Medical Listing 4.04 because the evidence does not establish [the required obstruction of specific arteries and] does not result in very serious limitations in the claimant's ability to independently initiate, sustain, or complete activities of daily living" (Tr. 20). This finding by the ALJ is not challenged by Byrd.

distracting to the adequate performance of work activities and that medications can cause side effects which impose some limitations but "not to such a degree as to create serious problems in most instances" (Tr. 235).

The record also contains evidence that Byrd's next visit to Dr. Fondren was on September 15, 2010, who merely noted that he complained of pain "mostly on the medial aspect of the ankle" and was given a prescription for Lortabs[10] (Tr. 255).  His next visit was not until January 6, 2011, when he was given a Depo-Medrol injection because it had resulted in improvement in the past and a new prescription for Lortabs (Tr. 254).  The last record of a visit by Byrd to Dr. Fondren is dated August 25, 2011, and indicates that "X-rays of the left foot do not show any significant pathology of the left fifth metatarsal, however, there is some ["slight'] prominence over this clinically" (Tr. 253).  Byrd was diagnosed as having an "[i]nflammation over the left fifth metatarsal head [and] [i]ncreasing left ankle arthritis" (Tr. 253).  A Depo-Medrol injection was planned and a prescription for Lortabs given (Tr. 253).

4.     The Administrative Law Judge's Decision.

After considering all of the evidence, the ALJ found that Byrd's traumatic arthritis of the left ankle and coronary artery disease were "severe" impairments (Tr. 18, Finding

---

[10] Dr. Fondren specifically prescribed "Lortab 7.5 mg. #50 with two refills" on September 15, 2010 (Tr. 255).  A similar prescription was given to Byrd on January 6, 2011 (Tr. 254).  It thus appears from the record, that Byrd required no more that 150 Lortab pills during the approximately126 day period from September 15, 2010 to January 6, 2011, which seems to indicate that he either went many days without any Lortab medication or took not more than two Lortabs on any one day.  *Cf.* Tr. 238 (similar prescription given May 14, 2009) with Tr. 237 (next Lortab prescription give November 3, 2009, approximately 123 days later).

No. 3), but that these impairments did not meet or medically equal any of the listed impairments in 20 C.F.R., pt. 404, Subpt. P, Appendix 1 (Tr. 19, Finding No. 4).  The ALJ additionally found that Byrd's subjective allegations of pain and functional limitations were not entirely credible (Tr. 26).  The ALJ specifically concluded:

> Medical records show that the fracture has continued to heal, but the claimant has continued to complain of pain.  X-rays of the lower left leg on January 18, 2006 showed that the external fixation device was in place transfixing the comminuted distal fibular and tibial fractures (Exhibit 3F-30).  The position and alignment of the fracture fragments were unchanged.  Treatment notes from January 25, 2006 show that the external fixator was removed and x-rays showed continued good position of the fracture (Exhibit 3F-29).  . . .
>
> The claimant required an arthroscopy and arthroscopic debridement of the left ankle in August 2006, because of intra-articular adhesions with fibrous tissue across the tibial plafond and scattered articular cartilage changes in the dome of the talus (Exhibit 3F-34).  The claimant did well following the arthroscopic debridement.  His range of motion was improving (Exhbit 3F-17).  He continued to have difficulty ambulating, however, and returned to physical therapy in September (Exhibit 3F-16).  His range of motion in the left ankle improved with physical therapy and he was having less swelling (Exhibit 3F-14).  . . .
>
> On May 15, 2007, the claimant had reached maximum medical improvement with a permanent partial disability rating of 30% in the left lower extremity secondary to loss of motion (Exhibit 3F-9).  He was instructed to continue using the brace and ibuprofen.  The claimant has continued to have pain and swelling but treatment has essentially remained the same with the ankle brace, ibuprofen for pain, and occasional Medro-Deprol injections.  Dr. Fondren added treatment with a muscle stimulator in September 2007 which claimant reports reduced his pain level (Exhibit 10F).  The claimant was evaluated in November 2008 and instructed to return as needed (Exhibit 3F-1).  He did not return to Dr. Fondren for treatment until six months later in May 2009, which shows that his pain was manageable with the brace and ibuprofen (Exhibit 10F).  In May 2009, he complained of an increase in pain, but he was neurovascularly intact with only mild swelling.  He returned again in November 2009 was a flare of left ankle pain . . . but had no swelling at the time.  He was given an injection of Depo-Medrol.  He did not require any follow-up treatment until July 2010 when he again complained of pain resulting from the traumatic arthritis.

Tr. 21-22.  The ALJ also found that

22

Moreover, the treatment he has received since the arthroscopic debridement has been routine and includes wearing a brace, taking pain medication, using a muscle stimulator, and receiving occasional injections.  He has not required frequent unscheduled visits to Dr. Fondren, and he has not required visits to the emergency room for exacerbations of pain or new injuries to the ankle.  The medical records show that the ankle fracture has progressively healed and that while the claimant has some residual pain and limitations, these limitations are not as severe as alleged.

Additionally, the medical records show that the claimant attempted to return to work with his previous employer with restrictions including no significant walking, no climbing, and no prolonged standing in July 2007, but the employer did not have any jobs available with these restrictions (Exhibit 3F-7).  The claimant's attempt to work with these restrictions serves as his acknowledgment that he is able to work with certain restrictions which have been identified in the [ALJ's] residual functional capacity.

Tr. 25.

The ALJ specifically found that Byrd retained the residual functional capacity ("RFC") to perform a limited range of light work that requires lifting and carrying no more than ten pounds frequently and no more than twenty pounds occasionally; sitting up to six hours in an eight-hour workday; standing or walking no longer than fifteen minutes at a time for no more that two hours in an eight-hour workday; and as to which he is unable to operate foot controls with the left foot; unable to climb ladders, scaffolds, or ropes; cannot work around unprotected heights or dangerous equipment; and is limited to no more than rarely climbing stairs and ramps, bending, stooping, kneeling, crouching and crawling (Tr. 20, Finding No. 5). Because Byrd's past relevant work as a logging truck driver is precluded by this residual functional capacity (Tr. 20, Finding No. 5), he is unable to perform his past relevant work (Tr. 28, Finding No. 6).

5.   <u>Vocational Expert Testimony</u>.

The ALJ relied upon the testimony of James Miller, a vocational expert. (Tr. 280-285).  Mr. Miller was asked to consider an individual with the same work history as Mr. Byrd limited to the AJC's RFC set forth above.  Mr. Miller confirmed that such an individual could not perform Byrd's past relevant work (Tr. 283).   He did, however, testify that such an individual could perform "some sedentary, unskilled occupations" which he set forth as:  microfilm document preparer, which is designated as DOT code 249587018 with an SVP of two, and is available nationally in numbers of 149,000 and Statewide of 1,200;  surveillance monitor, which is designated as DOT code 379367010 with an SVP of two, and is available nationally in numbers of 102,000 and Statewide of 868; and sedentary assembler, which is designated as DOT code 739687066 with an SVP of two, and is available nationally in numbers of 102,000 and Statewide of 1,500.

B.   <u>Analysis</u>.

Byrd argues, in sum, that "[t]here is no evidence of record from a treating or examining physician which supports the specific findings of the Commissioner with regard to Mr. Byrd's abilities to engage in work-related tasks [and] the Commissioner's RFC assessment significantly overstates his capabilities, either minimizing or ignoring his impairments."  (Doc. 11 at 5).  Byrd essentially relies upon Dr. Fondren's second physical capacities evaluation in which he concluded on July 23, 2010, that Byrd "could sit for only four (4) hours of an eight (8) hour day, and standing or walking is limited to less than one (1) hour, that would be less than five 5 hours."  (Doc. 11 at 8, *citing* Tr. 234).  Byrd also relies on Dr. Fondren's accompanying Clinical Assessment of Pain form

24

dated July 23, 2010, that "Byrd has pain which would distract him from the adequate performance of work activities." (Doc. 11 at 8, *citing* Tr. 235).

The Commissioner contends that Byrd's argument "has no legal merit." (Doc. 18 at 5). The Commissioner argues, in sum, that "there is no credible evidence of record to suggest that [Byrd's] functional limitations were in any way more limiting tha[n] those found by the ALJ." (Doc. 18 at 6).

"The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments." Richardson v. Commissioner of Social Sec., 2013 WL 1789463, * 2 (11th Cir. April 29, 2013), *citing* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 CFR § 404.1545(a). Along with his age, education and work experience, the claimant's residual functional capacity is considered in determining whether the claimant can work. 20 CFR § 404.1520(f). Here, the ALJ found that Byrd could "perform a limited range of light work." (Tr. 20, Findings #5). The ALJ found that Byrd can lift and carry up to 20 pounds occasionally and ten pounds frequently, can sit for up to six hours in an eight-hour workday, cannot stand or walk for longer than fifteen minutes at a time, and is limited to standing and walking for two hours total in an eight-hour workday, is unable to operate foot controls with the left foot, is unable to climb ladders, scaffolds, or ropes, cannot work around unprotected heights or dangerous equipment, is limited to no more than rarely climbing stairs and ramps, bending, stooping, kneeling, crouching, and crawling (*Id.*). The ALJ's decision will not be disturbed "if, in light of the record as a whole, it appears to be supported by substantial evidence." Lewis, 125 F.3d at 1439-40, *citing*

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.*, *citing* Richardson v. Perales, 402 U.S. 389, 401 (1971); MacGregor, 786 F.2d at 1053.  *See also*, Quick v. Commissioner of Social Sec., 403 Fed.Appx. 381, 383 (11th Cir. Nov. 15, 2010)(same).

1.    **The ALJ properly evaluated the opinions of Byrd's treating physician, Frank B. Fondren, III, M.D.**

Byrd's first challenge of the ALJ's RFC is based upon her failure to give any substantial weight to Dr. Fondren's second assessment of Byrd on July 23, 2010.   Byrd acknowledges that Dr. Fondren issued two separate opinions regarding Byrd's physical capacities, a year apart, that were inconsistent, but argues, in sum, that "while there were differences between the two forms, there was no difference in the standing limitation" and Dr. Fondren explained that the increased limitations were due to "worsening of [Byrd's] traumatic arthritis in his left leg and ankle."  (Doc. 11 at 6, *quoting* Tr. 239). However, with respect to the "standing limitation," the ALJ correctly noted that Dr. Fondren's opinion, namely that Byrd could only walk or stand for less than one hour during an eight hour day, is not supported by the record (Tr. 26, 232, 234).  The ALJ reasoned:

> Although the claimant testified that he can only stand or walk for fifteen minutes at a time, the evidence does not establish that he is able to stand and walk for less than one hour in an eight-hour workday.  The record shows that his ankle is stabilized by the brace (Hearing Testimony).  The claimant is able to walk the grandchildren to and from the bus stop. Moreover, the claimant tried to go back to work with his previous employer in 2007 with restrictions including no ***significant*** walking, no climbing, and no ***prolonged*** standing based on Dr. Fondren's advice (Exhibit 3F-7, 8).

> These factors show that the claimant is able to stand and/or walk for two hours in an eight-hour workday, but he can only stand and walk for fifteen minutes at a time.

(Tr. 27, emphasis added).  The record also contains the observations of the consulting physician who examined Byrd on May 16, 2009, Dr. Ozment, that Byrd was able to "walk easily into the examination room" without any assistance, could not only "sit comfortably" but "get on and off the examination table [and] take his shoes off and put them back on" (Tr. 213).  Dr. Ozment also observed that, although unable to perform without his brace, Byrd could tandem walk and bend over to within 10 inches of the floor with the brace.  (Tr. 214).  Dr. Ozment also reported that Byrd's muscle strength was 5/5 in upper and lower extremities with "***normal tone and normal bulk***" (Tr. 215, emphasis added).   These observations are inconsistent with Dr. Fondren's assessment but are consistent with the ALJ's RFC determination.   *See e.g.* Hollis v. Bowen, 837 F.2d 1378, 1384 (5th Cir. 1988)("[A]n absence of objective factors indicating the existence of severe pain—such as limitations in the range of motion, muscular atrophy, weight loss, or impairment of general nutrition—can itself justify the ALJ's conclusion.").

 With respect to Dr. Fondren's explanation of the other inconsistencies between his 2009 and 2010 assessments, namely the alleged "worsening" of Byrd's traumatic arthritis in the left ankle, the ALJ correctly found that the record is devoid of any evidence to support the supposition (Tr. 28).  The differences between Dr. Fondren's two assessments can be summarized as follows:

| Physical Capacities Evaluation Dated 7/31/09 | Physical Capacities Evaluation Dated 7/23/10 |
|---|---|
| Can sit 6 hours at one time. | Can sit 1 hour at one time. |

| Can sit 7 hours in an 8-hour workday. | Can sit 4 hours in an 8-hour workday. |
|---|---|
| Claimant can continuously lift up to 10 lbs. | Claimant can occasionally lift up to 25 lbs. |
| Claimant can occasionally carry up to 20 lbs. | Claimant can occasionally carry up to 10 lbs. |
| Mild restriction from being around moving machinery. | Total restriction from being around moving machinery. |
| Mild restriction from exposure to marked changes in temperature and humidity. | Moderate restriction from exposure to marked changes in temperature and humidity. |
| No restrictions from driving automobile. | Moderate restrictions from driving automobile. |
| No restriction from exposure to dust, fumes and gases. | Moderate restriction from exposure to dust, fumes and gases. |

(Tr. 232 and 234).  The ALJ found, however, that:

> A review of the medical records from July 2009 to July 2010, however,
> reveals that the claimant only saw Dr. Fondren twice during these twelve
> months (Exhibit 10F).  He presented to Dr. Fondren in November 2009
> with complaints of pain.  On examination, he had no obvious swelling.  Dr.
> Fondren gave the claimant a Depo-Medrol injection and Lortab for pain.
> The claimant presented to dr. Fondren again on July 23, 2010, the date the
> latest physical capacities evaluation was completed (Exhibit 10F).  At that
> time, the claimant complained of continued pain.  Treatment notes show
> that he was still wearing the brace.  Additionally, he reported that "he is
> unable to do anything in the way of any significant walking and only
> limited driving activities for his automobile."  Nothing in the treatment
> notes from this date show that Dr. Fondren administered any injections or
> prescribed any medications to the claimant on this date.  There were no
> findings from examination to warrant an increase in limitations.  Although
> Dr. Fondren bases his increase in limitations in the second physical
> capacities evaluation on claimant's worsening of his arthritis, nothing in his
> treatment notes supports this increase in limitations.  Therefore, the
> physical capacities evaluation dated July 23, 2010 is given little weight.

(Tr. 28, citing Tr. 236-238).  Additionally, as noted previously in this opinion, the

treatment Byrd received for his pain was consistent up to and including the prescription

he received from Dr. Fondren on January 6, 2011 for "Lortab 7.5 mg. #50 with two

refills" (Tr. 254).   Byrd's previous such prescription was been obtained on September

15, 2010 (Tr. 255), approximately 126 days before.  Byrd's next such prescription was

not sought until August 25, 2011 (Tr. 253), approximately 219 days later. *Cf. also*, Tr.

28

238 (similar prescription given May 14, 2009) with Tr. 237 (next Lortab prescription give

November 3, 2009, approximately 123 days later).  These records seem to indicate that

Byrd either went many days without any Lortab medication or took not more than two

Lortabs on any one day.  The medical record does not support the proposition that Byrd's

condition significantly worsened between July 2009 and July 2010.

Generally, the opinion of a treating physician must be given substantial weight, or

credit, unless "good cause" is shown to the contrary. Richardson, 2013 WL 1789463 at *

2;  Lewis, 125 F. 3d at 1440.  "Good cause exists when a medical opinion is not bolstered

by the evidence, where the evidence supports a contrary finding, or where the doctor's

opinions were conclusory or inconsistent with their own medical records." *Id.  See also*,

Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004); Edwards v. Sullivan, 937 F.2d

580 (11th Cir. 1991); 20 C.F.R. § 404.1527(c)(2)(if medical evidence is internally

inconsistent, the Commissioner may weigh all the evidence and make a decision if he can

do so on the available evidence); § 404.1527(d)(4) (generally, the more consistent an

opinion with the record as a whole, the greater weight it will be given).

The undersigned finds no error with the ALJ's decision to give less than

controlling weight to Dr. Fondren's opinion dated July 23, 2010, that Byrd can sit for

only four hours in an eight hour day and to that portion of both the July 31, 2009 and July

23, 2010 opinions of Dr. Fondren that Byrd can only stand or walk for less than one hour

in an eight-hour workday.  The ALJ has adequately articulated specific justification for

finding that Dr. Fondren's opinions in this regard are contrary to the other evidence of

record, and is not supported by his own records.  *See* Lewis, 125 F.3d at 1440 ("The ALJ

must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."), *citing* MacGregor, 786 F.2d at 1053; Moore v. Barnhart, 405 F.3d 1208, 1212(11th Cir. 2005)("ALJ here adequately articulated specific justification for discounting [treating physician's] opinion). Consequently, the ALJ properly evaluated and discounted the subject opinions of Byrd's treating physician, Dr. Fondren.

### 2.    The ALJ did not improperly ignore Dr. Fondren's opinion regarding Byrd's pain.

Byrd next argues, in sum, that "[t]he ALJ's failure to address the treating physician's opinions regarding Mr. Byrd's pain clearly runs afoul of the Commissioner's regulations."  (Doc. 11 at 9).[11]  According to Byrd, Dr. Fondren opined that "given the nature of the impairment, the degree to which pain is typically of major concern, and the extent to which his patient expressed the presence of pain and requested medication for its relief, Mr. Byrd has pain present to such an extent as to be distracting to the adequate performance of work activities."  (Doc. 11 at 8).   The Commissioner argues, in sum, that "[d]etermining the credibility of a claimant's testimony is the duty of the Commissioner . . . 'subject only to a limited review in the courts to ensure that the finding is supported by substantial evidence'."  (Doc. 18 at 10 *citing* Cartwright v. Heckler, 735 F.2d 1289 (11th Cir. 1984); Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1985).  The principle evidence relied on by the Commissioner is the finding by Dr. Ozment that Byrd showed

---

[11]  Byrd contends that the ALJ "implicitly, though not explicitly, rejected the opinion of Dr. Fondren regarding Mr. Byrd's pain."  (Doc. 11 at 9).

"no evidence of reduced muscle strength or muscle atrophy, as might be expected if he

were truly as limited as he claimed."  (Doc. 18 at 9, *citing* <u>Hollis</u>, *supra*, 837 F.2d at

1384).

The ALJ does specifically cite to the examining consultant's finding that Byrd's

"[m]uscle strength was 5/5 in upper and lower extremities with normal tone and normal

bulk" (Tr. 23).  The ALJ also reasoned:

> The claimant credibly has pain and limitation resulting from the traumatic
> arthritis; however, the record demonstrates that he is able to perform a
> limited range of light work.  Treatment notes from Dr. Fondren show that
> the fracture has progressively healed (Exhibit 3F).  A series of x-rays over
> the months following the external fixation demonstrated that the fracture
> was healing and aligning and the joint space looked good.  The claimant
> has not required excessive treatment.  Treatment notes show that from
> March 2006 to May 2007, the claimant was evaluated by Dr. Fondren
> approximately once a month. From May 2007 to November 2008, he was
> evaluated on an as needed basis, which has been about every six months.
> The frequency of treatment shows that since the claimant reached
> maximum medical improvement in May 2007, he has required less frequent
> treatment demonstrating that the fracture has healed sufficiently to allow
> the claimant to go for longer periods without medical attention.
> Additionally, the brace prescribed in April 2007 stabilized his ankle and is
> aiding hid ambulation and range of motion as indicated by the findings
> from the consultative examination (Exhibit 4F).  I note that the claimant
> was not prescribed the brace and did not reach maximum medical
> improvement until more than twelve months after the injury; however, the
> medical records show that he steadily improved from the date of the
> accident through these dates.  There is no exact objective finding in the
> record that shows claimant had reached maximum medical improvement,
> rather, Dr. Fondren apparently relies on the claimant's plateau of
> improvement which began in August 2006 after the arthroscopic
> debridement of the ankle when claimant's range of motion began
> improving and he began physical therapy (Exhibit 3F-17).

(Tr. 23).  The ALJ further found:

> [T]he treatment [Byrd] has received since the arthroscopic debridement has
> been routine and includes wearing a brace, taking pain medication, using a

muscle stimulator, and receiving occasional injections.  He has not required
frequent unscheduled visits to Dr. Fondren, and he has not required visits to
the emergency room for exacerbations of pain or new injuries to the ankle.
The medical records show that the ankle fracture has progressively healed
and that while the claimant has some residual pain and limitations, these
limitations are not as severe as alleged.

Additionally, the medical records show that the claimant attempted to
return to work with his previous employer with restrictions including no
significant walking, no climbing, and no prolonged standing in July 2007,
but the employer did not have any jobs available with these restrictions
(Exhibit 3F-7).  The claimant's attempt to work with these restrictions
serves as his acknowledgement that he is able to work with certain
restrictions which have been identified in the residual functional capacity.

(Tr. 25).  Byrd also testified, in sum, that he pain manifested itself in cramps two to three

times a day lasting three to seven seconds (Tr. 272); in numbness for which he applies his

muscle stimulator for two or three minutes (Tr. 273); in stiffness when he sits awhile for

which he gets up and moves around (Tr. 274, 279); and in swelling of the left ankle

"[p]retty much every day"  "but it's not real, real bad" for which he elevates his foot

probably three or four hours a day and, if necessary, uses the stimulator for two or three

minutes (Tr. 279-280).  Byrd also testified that the only medicine he takes for his foot

with its arthritis is Lortab, Aleve and cortisone shots (Tr. 274).  Byrd in no way indicated

that his pain "is frequently present to such an extent as to be distracting to the adequate

performance of work activities" but instead, as noted by the ALJ, indicated that he had no

difficulty understanding his television shows and thus that "his pain does not interfere

with his concentration" (*see* Tr. 25, 277, 231, 235).

"[T]he decision concerning the Plaintiff's credibility is a function solely within

the control of the Commissioner and not the courts." Sellers v. Barnhart, 246 F. Supp. 2d

1201, 1213 (M.D. Ala. 2002). The assessment of a claimant's credibility about pain and

its effect on his ability to function must be based on consideration of all the evidence.

*See* 20 C.F.R. § 404.1529; SSR 96-7p.  Moreover, "the severity of a medically

ascertained impairment must be measured in terms of its effect upon ability to work and

not simply in terms of deviation from purely medical standards of bodily perfection or

normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986); 20 C.F.R. §

404.1529(a) (we will determine the extent to which your alleged functional limitations

and restrictions due to pain can reasonably be accepted as consistent with the medical

signs and laboratory findings).

     Here, the ALJ found that, although plaintiff's underlying medical condition could

reasonably be expected to produce the symptoms alleged, his statements concerning the

intensity and limiting effects of his symptoms were not credible (Tr. 23).  In making her

assessment of Byrd's credibility about pain and its effect on his ability to function, the

ALJ based her assessment on consideration of all the evidence of record, not just the fact

that plaintiff sought treatment. *See* 20 C.F.R. § 404.1529; SSR 96-7p. Although the ALJ

did not specifically refer to Dr. Fondren's Clinical Assessment of Pain form, she

adequately addressed the issue regarding Byrd's pain.  The evidence of record, including

Byrd's own testimony, does not support Dr. Fondren's contention that Byrd's pain "is

frequently present to such an extent as to be distracting to the adequate performance of

work activities"  (Tr. 231, 235).

3.    **The ALJ properly determined Byrd's Residual Functional Capacity in view of all the evidence of record.**

The undersigned finds no error with the ALJ's determination that Byrd has the residual functional capacity to perform the limited range of light work described above and that substantial evidence in the record supports her determination.  The residual functional capacity assessment is a measure of what plaintiff can do despite functional limitations. 20 C.F.R. § 404.1545; 20 C.F.R. § 416.945.  The rulings define residual functional capacity as what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work- related physical and mental activities. Social Security Ruling 96-8p: Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, *2. Because a residual functional capacity determination is an "administrative assessment", it is the function of the ALJ to determine the plaintiff's residual functional capacity through examination of the evidence and resolution of conflicts in the evidence.  Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996); 20 C.F.R. § 404.1546, 20 C.F.R. § 416.946. The ALJ must base the assessment upon all of the relevant evidence of the plaintiff's remaining ability to work in spite off his impairments. Lewis, *supra*, 125 F.3d at 1440; 20 C.F.R. § 404.1546; 20 C.F.R. § 404.1527; 20 C.F.R. § 416.946; 20 C.F.R. § 416.927.

Byrd's principle challenge to the ALJ's RFC determination is that "the decision of the Commissioner is not linked to the evidence" and "[t]he Commissioner does not

specify . . . what evidence supports [the ALJ's] RFC." (Doc. 11 at 11). The Commissioner argues, in sum, that the ALJ properly considered the evidence of record; properly discounted Dr. Fondren's RFC opinions to the contrary; properly discounted Byrd's claims of extreme pain; and "there is no credible evidence of record to suggest that Plaintiff's functional limitations were in any way more limiting tha[n] those found by the ALJ." (Doc. 18 at 5-6).

As amply demonstrated above, the ALJ properly analyzed all the medical evidence of record and Byrd's description of his pain and limitations to arrive at her RFC. Byrd's contention that there is no link between the evidence of record and the RFC is without merit. As the ALJ expressly concluded:

> The physical capacities evaluation completed on July 31, 2009 is not inconsistent with the record as a whole; however, the evidence does not fully support the findings in the physical capacities evaluation. First, the record shows that while claimant does not have any impairments related to his back or arms, the traumatic arthritis in his foot affects his ability to lift and carry heavy objects. Accordingly, Dr. Fondren's opinion concerning the claimant's ability to lift and carry[up to twenty-five pounds occasionally and ten pounds continuously and carry up to twenty pounds occasionally (Exhibit 7F)] is given great weight. Additionally, the record shows that the climant is able to sit for long periods of time. When asked what he does during the day, he stated that he sits and watches television (Hearing Testimony). Therefore, Dr. Fondren's opinion regarding the claimant's ability to sit [for seven hours in an eight-hour workday] is given great weight. The opinion regarding the claimant's ability to stand and/or walk [for less than one hour in an eight-hour workday] is not supported by the evidence of record. Although the claimant testified that he can only stand and walk for fifteen minutes at a time, the evidence does not establish that he is able to stand and walk for less than one hour in an eight-hour workday. The record shows that his ankle is stabilized by the brace (Hearing Testimony). The claimant is able to walk the grandchildren to and from the bus stop. Moreover, the claimant tried to go back to work with his previous employer in 2007 with restrictions including no **significant** walking, no climbing, and no **prolonged** standing based on Dr.

35

Fondren's advice (Exhibit 3F-7, 8). These factors show that the claimant is able to stand and/or walk for two hours in an eight-hour workday, but he can only stand and walk for fifteen minutes at a time.

Dr. Fondren's opinion that the claimant is totally unable to bend, squat, crawl, or climb is not fully supported by the record as the claimant has not been diagnosed with any back, hip, or knee problems. Further, the claimant was able to bend at the consultative examination (Exhibit 4F). Nevertheless, the left ankle arthritis reasonably results in the claimant being limited to rarely climbing stairs and ramps, bending, stooping, kneeling, crouching, and crawling. The claimant is precluded from climbing ladders, scaffolds, and ropes. The opinion that the claimant can continuously reach and can use his hands for simple grasping, pushing and pulling, and fine manipulation is consistent with the record. The assessment that he is unable to use his left leg or both legs for repetitive movements as in pushing and pulling of leg controls, but he can use his right leg is supported by the evidence. Moreover, the portion of the physical capacities evaluation that the claimant is unable to work around unprotected heights is consistent with the record. Dr. Fondren's estimation that the claimant has mild limitations in activities involving being around moving machinery and exposure to marked changes in temperature and humidity is partially consistent with the record. The claimant's limitation in movement resulting from the arthritis would cause limitations in his ability to be around moving machinery; however, nothing in the record shows that the claimant's impairments restrict his exposure to marked changes in temperature and humidity. Although he experiences some swelling in his ankle, there is no evidence that this is caused by changes in temperature and humidity. The claimant has not complained of swelling or pain caused by changes in temperature and humidity and treatment notes do not show that he has reported this to Dr. Fondren. Finally, the assessment that the claimant has no limitations in driving automobile equipment or exposure to dust, fumes, or gases is consistent with the record as a whole.

(Tr. 27, emphasis added).

The ALJ has clearly linked every aspect of her RFC to the evidence of record, which is substantial. Consequently, this case is distinguishable from Clark v. Astrue, 2012 WL 2958216, * 8 (S.D. Ala. July 19, 2012)( Because the ALJ did not articulate any reason—much less an adequate reason, supported by substantial evidence—for rejecting

this portion of Dr. Hussain's PCE assessment, "this Court must necessarily find that the ALJ's RFC determination is not supported by substantial evidence."), *quoting* <u>Thomas v. Astrue</u>, 2012 WL 1145211, at *9 (S.D.Ala. Apr. 5, 2012) ("Because the undersigned finds that the ALJ did not explicitly articulate an adequate reason, supported by substantial evidence, for rejecting a portion of [the treating physician's] PCE assessment, this Court must necessarily find that the ALJ's RFC determination is not supported by substantial evidence ."). The ALJ thus committed no error in this case.

CONCLUSION.

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that the decision of the Commissioner denying plaintiff's application for disability benefits is supported by substantial evidence and is due to be and is hereby **AFFIRMED**.

Done this   15th   day of August, 2013.

<u>/s/ Katherine P. Nelson</u>
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**